DANIEL LANNING *vs.* RICE TOMPKINS and BENJAMIN CAR-
PENTER, impleaded with others.

Where an attempt is made to create a lien which shall have precedence of all others ; the agreement for that purpose being founded in a good and valuable consideration, and the parties undertaking to give it effect in good faith ; but the attempt fails because of the failure of the machinery upon which they relied, through a defect in a statute, it is the plain duty of a court of equity to supply the legal formalities necessary to secure to the party the rights intended to be secured to him by the agreement.

C. confessed a judgment to L. it being expressly agreed that it should have preference over a judgment in favor of S. and others confessed at the same time, and all other claims, and that it should be first docketed, in order to secure to it such preference and priority. S. and others had notice of this agreement, and assented to it, and in consideration of it, L. incurred new liabilities for and on account of C. Both judgments were entered and docketed, in Schuyler county, which all the parties then supposed had been legally erected and organized as a county ; L's judgment being first in point of time. Execution was afterwards issued upon L's judgment, and the property of C. seized, by virtue thereof, by the person elected as sheriff of the supposed county. Proceedings upon this execution were stayed by order of the court, and the courts afterwards held and decided that the statute by which said county was attempted to be erected and organized was unconstitutional and void. Consequently L.'s judgment, not being docketed in a proper place, was never perfected and ripened into a final judgment, upon which a valid execution could be issued. *Held* that the equity powers of the Supreme Court were sufficient to give force and effect to this agreement, and to cause it to be executed according to the intention of the parties, notwithstanding the failure of the legal means and instrumentalities through which they designed it should be done.

Lanning *v.* Tompkins.

*Held, also,* that although the statute was found to lack the constitutional force and vigor necessary either to beget, or to uphold and maintain, the body of a legitimate county organization, the agreement still remained and continued a valid subsisting agreement, capable of being enforced and executed, depending in no respect for its binding force upon the validity of the statute by which the county was sought to be organized.

THIS action was brought by the plaintiff against John Carpenter, John J. Swartwout, Albert I. Van Gorder, and the appellants, to obtain relief in consequence of the entry of a judgment, by confession, in the county of Schuyler before it became a county, and to enforce an equitable lien created by the agreement under which the confession of said judgment was given. The action was tried at a special term held in Penn Yan by Hon. H. WELLES, Justice, on the 2d of June, 1862. The facts set forth in the complaint and as found by the court are substantially as follows: That prior to the 14th of July, 1855, the plaintiff and the defendant, John Carpenter, had been in the business of purchasing stock for the eastern market. On the 14th of July, 1855, John Carpenter was indebted at the banks in the sum of $5000, secured by the indorsement of Delazon J. Sunderlin, Benson Smith, Rice Tompkins and Benjamin Carpenter. On the 14th of July, 1855, the plaintiff held two notes against J. Carpenter for money lent, upon which there was due $450. J. Carpenter at the time was the owner of real and personal property to a large amount. D. J. Sunderlin was liable as indorser for J. Carpenter on two notes for $1000 each, held by the bank of Havana, one past due, upon which had been paid $400; the other was about to fall due. On said 14th of July, Sunderlin, Smith, J. Carpenter and the plaintiff met at Elmira, when a settlement was made between the plaintiff and J. Carpenter, and there was found a balance due the plaintiff of $452. It was then and there agreed between the parties present, Smith, acting for himself, B. Carpenter and Rice Tompkins, the appellants, that in consideration that the plaintiff would assume and pay the note

indorsed by Sunderlin, then about to fall due at Havana, for $1000, J. Carpenter should and would confess a judgment to the plaintiff for $1450, the amount of said note and the balance due him; which judgment was to be entered so as to be the first lien upon Carpenter's property. Carpenter was to furnish Sunderlin with the means to take up the note then past due. Carpenter was to confess a judgment to Smith, Tompkins and B. Carpenter for $3500, as an indemnity to them as his indorsers, and which was to be entered after the judgment to the plaintiff, and to be a junior lien. J. Carpenter, by the agreement, was to pay the plaintiff $1000 within ninety days, for which time execution was to be stayed upon the judgment to the plaintiff. In the meantime Smith, who at the time was engaged in manufacturing lumber from the timber on the lands of J. Carpenter, was to continue the manufacturing of said timber into lumber under his agreement with Carpenter, and the proceeds belonging to Carpenter were to be applied upon the notes indorsed by Smith, B. Carpenter and Tompkins for J. Carpenter. The plaintiff relying upon the agreement made, gave his note for $1000, payable at Havana in three months, which was indorsed by Sunderlin and H. G. Wolcott, and delivered to Sunderlin to take up the note indorsed by him, about to fall due. In pursuance of the agreement, J. Carpenter furnished Sunderlin with the means to take up the note indorsed by him, past due. Two confessions of judgment were made by J. Carpenter; one to the plaintiff for $1450, and one to Smith, B. Carpenter and Tompkins for $3500, which confessions were then delivered to Sunderlin to be filed in the proper office, and judgment entered thereon as agreed. On the same day Sunderlin went to the bank and paid and took up the note indorsed by him, past due, and with the plaintiff's note took up the note indorsed by him, about to fall due. On the same day, 14th July, Sunderlin filed the confession of judgment in favor of the plaintiff in the clerk's office of Schuyler county, and had judgment entered thereon,

at the same time leaving the confession in favor of Smith, B. Carpenter and Tompkins with said clerk, with directions to file the same the next business day and enter judgment thereon, which was done on the 16th, the 15th being Sunday. Smith, under and in pursuance of the agreement, continued to manufacture the timber of Carpenter into lumber up to the 15th of October, 1855, during which time the proceeds belonging to J. Carpenter amounted to $988, $402 of which was paid on the notes at bank indorsed by Smith and B. Carpenter for J. Carpenter, $300 of which was paid over to B. Carpenter, and the balance applied for J. Carpenter's benefit, with his consent; the $1450 due the plaintiff remaining unpaid and is still due and unpaid, with interest thereon, no part having been paid, and John Carpenter is wholly insolvent. Smith, within a day or two after the agreement at Elmira, informed B. Carpenter and Tompkins of the same and all that had been done, to which they made no objection. On the 18th of July, 1855, John Carpenter executed a bill of sale of a large amount of his personal property to B. Carpenter; in consideration of $3500 to be paid by B. Carpenter, by paying the notes at bank, for which the judgment had been confessed to him, Smith and Tompkins, which bill of sale was written and witnessed by Smith. That the bill of sale was made and taken in violation of the agreement of the 14th of July, and was fraudulent and void as against the plaintiff. That a day or two prior to the 14th of October, 1855, John Carpenter employed a number of men and felled three hundred of the trees standing upon his land, and on the 15th of October turned the said trees and timber so felled, out to B. Carpenter and Tompkins to indemnify them as his indorsers upon the notes mentioned in the confession of judgment to them. That the cutting said trees and turning the same out, was a violation of said agreement, and was fraudulent and void as against the plaintiff. Execution was issued upon the plaintiff's judgment, and delivered to Swartwout, then acting as sheriff of Schuyler county,

on the 14th day of October, 1855. On the 15th, Swartwout, as such sheriff, levied upon all the personal property of J. Carpenter, including the trees so cut as aforesaid. Soon after the levy the property was advertised for sale by the sheriff on the 27th of November, 1855, which was postponed by an order staying the plaintiff's proceedings upon his judgment, which order was obtained by Smith, B. Carpenter and R. Tompkins. On the 1st of December, 1855, notice of motion was given on the part of Smith, B. Carpenter and Tompkins to set aside and vacate the plaintiff's judgment and execution, with an order staying the proceedings, which order was subsequently modified so as to allow a sale under the execution, the sheriff to retain the proceeds or bring them into court. On the 29th of February, 1856, the property levied upon was sold by Albert I. Van Gorder as deputy under Swartwout, sheriff, amounting to $1144. The property sold for its full value, except one horse claimed by Mrs. Carpenter, which sold for $29, worth $110, and was purchased by the plaintiff. $903 worth of property went into the hands of Smith and Tompkins, for which they gave their note to the deputy, payable to the sheriff, and which still remains unpaid. Smith and Tompkins took possession of the property and sold and converted it to their own use. The plaintiff purchased property at the sheriff's sale to the amount of $85, for which he gave his note to the sheriff, and which is unpaid and remains in the hands of Van Gorder, the deputy. The 13th of December, 1856, an order was made at general term, on motion, on behalf of Smith, B. Carpenter and R. Tompkins, vacating and setting aside the plaintiff's judgment and execution, upon the sole ground that the act of 1854, erecting the county of Schuyler, was unconstitutional. On the 10th of March, 1863, there was due from Smith and Tompkins, on their note given to the sheriff, $1347.21. At the time of the sale by the sheriff there was in the hands of Smith $116, arising from the sales of a part of the lumber levied upon, and which still remains

in the hands of Smith. Upon the facts aforesaid the court, as a conclusion of law, found as follows : 1st. That under the agreement of the 14th of July, made at Elmira, the plaintiff obtained an equitable lien upon the property and effects of John Carpenter, as against him and the defendants, Smith, B. Carpenter and Tompkins, which entitled the plaintiff to preference and priority over all subsequent liens which they might have upon the property levied upon. That under said agreement, and in consideration of which, the plaintiff gave his note to take up J. Carpenter's note at bank, indorsed by Sunderlin, for $1000; in pursuance of which, the confession of judgment by Carpenter to the plaintiff was given and should have the same force and effect in equity as if the same had been filed and judgment entered in the proper county; what was agreed to be done should be regarded as done. That the plaintiff was equitably entitled to the proceeds arising from the sheriff's sale, and that said proceeds should be paid over to him. That the plaintiff should have judgment against Tompkins and Smith for the sum of $903, the amount of their note to the sheriff, with the interest thereon to 10th of March, 1863, amounting to $1347.21. That the plaintiff should have the further judgment against the sheriff, directing him to deliver and pay over to the plaintiff all proceeds arising from said sale. And that the plaintiff have judgment against Benson Smith for $116, and the interest from 29th of February, 1856, on account of the sale made by him of the property levied on prior to the sheriff's sale, amounting to the sum of $173.60 on the 10th of March, 1863. That the plaintiff have judgment that the defendants, Smith, Tompkins and B. Carpenter be perpetually restrained, &c. And that the plaintiff have judgment against B. Carpenter and Tompkins for his costs and disbursements. The defendant John Carpenter died after the trial and before the decision, some time in the month of March, 1863. The judgment was directed to be entered as of the 10th of March, 1863, a day prior to his death. The findings and decision of the

court were filed, and judgment entered with the clerk of
Yates county on the 15th of March, 1864, as of the 10th of
March, 1863. To which the defendant Benjamin Carpenter
and Rice Tompkins excepted, and appealed to the general term.

*G. H. McMaster,* for the appellants.

*D. B. Prosser,* for the respondent.

*By the Court,* JOHNSON, J. Upon the facts found by the
Judge at special term, the question is distinctly presented for
our determination, whether this court has power to give force
and effect to the plaintiff's imperfect and defective judgment,
and secure to it preference and priority over the defendant's
claims, according to the agreement and intention of the par-
ties at the time the judgment was confessed. By the find-
ing, the fact is established, that at the time this judgment was
confessed, it was expressly agreed between the defendant
therein, and the plaintiff, that the same should have prefer-
ence over the defendants' judgments, and all other claims,
and that it should be first docketed to secure to it such pre-
ference and priority. This agreement was made known to
these defendants, and assented to by them ; and in considera-
tion of it, the plaintiff incurred new liabilities for and on
account of the defendant in his judgment. In pursuance of
the agreement, both the plaintiff's and the defendants' judg-
ments were entered and docketed in such a manner in respect
to time as to insure priority to the plaintiff's. The parties
all resided, and the property was situated, within the bounda-
ries of Schuyler county, which the parties all then supposed
and believed had been legally erected and organized as a
county, and the judgments were there docketed in exact
accordance with their agreement. Execution was afterwards
issued upon the plaintiff's judgment, and the property of the
defendants therein seized, by virtue thereof, by the person
elected as sheriff of the supposed county. Proceedings upon
this execution were stayed by order of the court, and the

Lanning *v.* Tompkins.

courts afterwards held and decided that the statute by which said county was attempted to be erected and organized was unconstitutional and void. Consequently the plaintiff's judgment, not being docketed in a proper place, was never perfected and ripened into a final judgment, upon which a valid execution could be issued. In consequence of this, the whole scheme miscarried, and it became impossible to carry out the agreement by and through the machinery of the law as the parties contemplated. It remains to be seen, therefore, whether the equity powers of this court are sufficient to give force and effect to this agreement, and to cause it to be executed according to the intention of the parties, notwithstanding the failure of the legal means and instrumentalities through which they designed it should be done.

Although the statute was found to lack the constitutional force and vigor necessary either to beget or to uphold and maintain the body of a legitimate county organization, the agreement still remained and continued a valid subsisting agreement, capable of being enforced and executed, depending in no respect for its binding force upon the validity of the statute by which the county was sought to be organized.

The failure of the statute broke the machinery by means of which the agreement was to be carried into execution, and affected it to that extent, but did not touch its vital character, as a valid binding agreement. If we have the power, there can be no doubt, I think, but that we should exercise it, in the plaintiff's favor, in this case. The process of giving relief will be found to be greatly simplified in the fact that the property in controversy has been converted into money.

After a careful consideration of the whole question, I have come to the undoubting conclusion that this court is clothed with ample power to effectuate the intention of the parties, and to secure to the plaintiff the benefit of his agreement which he would otherwise inevitably lose through no fault or neglect on his part. This is to be done not in the exact mode contemplated by the parties, but by other means to be sup-

plied by the court, in furtherance of justice, and to prevent its entire failure.

It is one of the leading and cardinal maxims of equity, to regard that as already done which parties have agreed should be done, and which ought to have been done. Story, in his commentaries on *Equity Jurisprudence,* says: "The true meaning of this maxim is, that equity will treat the subject as to collateral consequences and incidents, in the same manner as if the final acts contemplated by the parties had been executed exactly as they ought to have been ; not as the parties might have executed them." (*Eq. Jur.* § 64, *g.*)

Upon the same principle, equity constantly treats land as money, or money as land, whenever either is directed by wills or other instruments to be converted into the other. And in like manner liens, in the nature of equitable mortgages, are decreed and enforced against real and personal estate where security of that character has been promised or intended by the parties, though not in form executed and delivered. Lord Loughborough said, in reference to such cases, in the leading case of *Russel* v. *Russel,* (1 *Bro. C. C.* 269,) "The court has nothing to do but to supply the legal formalities. In all these cases the contract is not to be performed, but is executed." In the "*American Notes*" to the case above cited, (*Lead. Eq. Cas.* 40, *Law Lib.* 4th *series,* 467,) it is said : "It has been held in many of the courts in this country that an agreement in writing to give a mortgage, or a mortgage defectively executed, or any imperfect attempt to create a mortgage, or to appropriate specific property to the discharge of a particular debt, will create a mortgage in equity, or a specific lien, which will have precedence of subsequent creditors." Several cases decided in this country are cited in support of this rule. Additional cases might be cited, as *Haverly* v. *Becker,* (4 *Comst.* 169 ;) *Craig* v. *Leslie,* (3 *Wheat.* 563,) and many others, all tending in the same direction.

The case at bar falls clearly within the principle. Here was an attempt to create a lien which should have precedence

of all others. The agreement was founded in a good and valuable consideration, and the parties undertook to give it effect in good faith. The attempt failed, because of the failure of the machinery upon which they relied, through a defect in the statute. Under such circumstances, I think it is the plain duty of the court "to supply the legal formalities" necessary to secure to the plaintiff the rights intended to be secured to him by the agreement. The defendants are in no respect strangers to this agreement, who have acquired subsequent rights without notice, and in good faith, and do not come within the exceptions to the above rule.

It would be unjust, therefore, to permit them to take advantage of the defective docketing of the plaintiff's judgment, and thus deprive him of the rights and the precedence intended to be secured to him by the agreement, in which all were interested, and all acquiesced.

I am of the opinion that the judgment at the special term was right in all respects, and should be affirmed, with costs.

Judgment affirmed.

[Monroe General Term, March 5, 1866. *Welles, E. D. Smith* and *Johnson,* Justices.]